**SO ORDERED.**

**SIGNED this 10th day of April, 2026.**




LENA MANSORI JAMES
UNITED STATES BANKRUPTCY JUDGE

---

## UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| Prairie E&L Management, LLC, | ) | Case No. 25-10087 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| ——————————————— | ) | |
| | ) | |
| Vicki L. Parrott, Chapter 7 Trustee for Prairie E&L Management, LLC, | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No. 25-02016 |
| | ) | |
| Sandra Yeh, M.D., an individual, and Blue Daffodil, LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

ORDER AND OPINION
GRANTING IN PART AND DENYING IN PART DEFENDANT YEH'S MOTION TO DISMISS

This adversary proceeding is before the Court on the Motion to Dismiss

Plaintiff's Amended Complaint filed by Sandra Yeh under Rule 12(b)(6) of the

Federal Rules of Civil Procedure, as made applicable to this proceeding by Federal

Rule of Bankruptcy Procedure 7012, for failure to state a claim upon which relief

can be granted. For the reasons stated below, the Court will grant defendant

Sandra Yeh's request to dismiss the second cause of action but will otherwise deny the motion.

## PROCEDURAL BACKGROUND

Prairie E&L Management, LLC is the debtor in the underlying bankruptcy case (the "Debtor") and Vicki L. Parrott (the "Trustee") is the duly appointed and acting chapter 7 trustee. The Trustee filed a Complaint (Dkt. No. 1) initiating this adversary proceeding on August 11, 2025, asserting a single cause of action against Dr. Sandra Yeh.[1] (*Id.* ¶¶ 98-110). The Trustee sought to avoid and recover the Debtor's January 2018 payment of approximately $12.5 million to purchase Dr. Yeh's medical practice under N.C. Gen. Stat. § 39-23.4(a)(1) through the strong-arm powers under 11 U.S.C. § 544. (*Id.*). The Trustee claimed the payment was a voidable transfer made "with intent to hinder, delay, or defraud" the Debtor's creditors, positing that the illegality of the sale under the Illinois Medical Corporation Act ensured the Debtor received "nothing of value" for the payment made to Dr. Yeh. (*Id.* ¶¶ 103, 109).

Dr. Yeh timely filed a motion to dismiss, which the Court granted on January 8, 2026, dismissing the Complaint without prejudice. (Dkt. No. 40). The Court found the Trustee failed to adequately plead any badges of fraud regarding the transfer and the Complaint's general descriptions of the criminal activities of Greg Lindberg,

---

[1] The Complaint also included two causes of action against defendant Blue Daffodil, LLC. (Dkt. No. 1, ¶¶ 111-23). Though an agent filed a proof of claim on its behalf in the bankruptcy case, Blue Daffodil did not answer the Complaint, and the Clerk of Court entered default on October 1, 2025. The Court entered default judgment two weeks later, disallowing Blue Daffodil's claim and voiding any security interest Blue Daffodil held in the Debtor's assets. (Dkt. No. 22).

2

the Debtor's principal, did not sufficiently allege an intent to hinder, delay, or defraud creditors with respect to the specific transfer to Dr. Yeh. The Court granted the Trustee leave to amend to assert additional facts that, if taken as true, would establish direct or circumstantial evidence of such intent, including relevant badges enumerated in N.C. Gen. Stat. § 39-23.4(b). (*Id.*; Dkt. No. 39).

The Amended Complaint now asserts three separate causes of action against Dr. Yeh. Though each claim is brought on behalf of a different "triggering" creditor, all similarly challenge the initial $10 million transfer to Dr. Yeh, as well as the Debtor's obligation to pay the remaining balance of the $25 million purchase price, as voidable and made with actual intent to defraud the Debtor's creditors. (Dkt. No. 42). Dr. Yeh moved to dismiss all three claims and filed a brief in support, (Dkt. No. 43, 44, collectively, the "Motion"), arguing the Amended Complaint suffers from the same fundamental defects as the Complaint. In addition, Dr. Yeh argues that the second cause of action should be dismissed because insurance policyholders do not hold allowable claims against the Debtor and are therefore not triggering creditors for purposes of 11 U.S.C. § 544(b)(1). (*Id.* at 20-21). The Trustee filed a response, (Dkt. No. 48), asserting the Amended Complaint plausibly alleges the Debtor intended to defraud its creditors when making the transfer and incurring the obligation, urging the Court to deny the Motion. (*Id.* at 3). The Court took the

3

matter under advisement without hearing or oral argument in accordance with Local Rule 7007-1(d).[2]

## JURISDICTION

This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334. Under 28 U.S.C. § 157(a) and Local Civil Rule 83.11, the United States District Court for the Middle District of North Carolina has referred this proceeding to this Court. And proceedings to determine, avoid, or recover fraudulent conveyances are core proceedings. 28 U.S.C. § 157(b)(2)(H).

Nevertheless, while bankruptcy judges may "hear and determine . . . all core proceedings arising under title 11," the Supreme Court has clarified that "statutory authority under section 157(d) is not enough; constitutional authority must exist as well." *Mason v. Ivey*, 498 B.R. 540, 545 (M.D.N.C. 2013) (citing *Stern v. Marshall*, 564 U.S. 462 (2011)). And there are some claims designated as core proceedings under § 157(b) that the bankruptcy court does not have the constitutional authority to adjudicate. *See Stern*, 564 U.S. at 487-90. In these instances, so-called "*Stern* claim" proceedings, the bankruptcy judge is limited to submitting proposed findings of fact and conclusions of law to the district court, which then reviews *de novo* any matter to which a party objects, unless all parties consent otherwise. 28 U.S.C. § 157(c); *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 35-37 (2014).

---

[2] Dr. Yeh filed a Reply in Support of Motion to Dismiss on March 9, 2026 (Dkt. No. 49), a week after the matter was taken under advisement. Dr. Yeh filed it without leave of the Court but given the absence of any objection or motion to strike, the Court has taken the Reply into consideration in this Order and Opinion.

Although "courts have disagreed concerning the characterization of fraudulent transfer claims as constitutionally core claims," *Camac Fund, L.P. v. McPherson (In re McPherson)*, 630 B.R. 160, 174 (Bankr. D. Md. 2021), this Court has taken the position that adjudication of fraudulent transfer actions "follows the practice of non-core proceedings with the bankruptcy court having authority only to enter proposed findings of fact and conclusion of law, despite the cause of action being listed in 28 U.S.C. § 157(b) as core." *Daniel v. Jones Fam. Holdings, LLC (In re Daniel)*, 556 B.R. 722, 724 (Bankr. M.D.N.C. 2016) (citing *Arkison*, 573 U.S. at 35).

The Federal Rules of Bankruptcy Procedure require both pleaders and responding parties to expressly state whether the party consents to entry of final orders or judgment by the bankruptcy court. Fed. R. Bankr. P. 7008(a), 7012(b). But a litigant may also impliedly consent to final adjudication by the bankruptcy court of both non-core matters and *Stern* claims so long as the consent is "knowing and voluntary," and it may do so through "actions rather than words." *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683-86 (2015); *see Mason*, 498 B.R. at 548-550 (holding that by filing a bankruptcy proof of claim, defendants consented to entry of a final order as to that claim—including adjudication of a fraudulent transfer proceeding).

In accordance with Rule 7008, the Trustee expressly consented to the Court's authority to enter a final judgment in both the Complaint and the Amended Complaint. (Dkt. No. 1, ¶ 13; Dkt. No. 42, ¶ 15). Although forewarned by the

Trustee's pleadings and the requirements of Rule 7012(b),[3] Dr. Yeh failed to indicate in the Motion whether she consents to entry of final orders or judgment by this Court. Although Dr. Yeh's conduct in pursuing dismissal may indicate implied consent,[4] it is unnecessary at this stage to determine the Court's constitutional authority to enter a final order or judgment on the claims in this proceeding. Because "an order dismissing only one claim in a multi-claim adversary proceeding does not amount to a final order," *Kiviti v. Bhatt*, 80 F.4th 520, 530 (4th Cir. 2023), this Order dismissing the second cause of action but denying the balance of the Motion is not one requiring consent of the parties and raises no jurisdictional impediments.

APPLICABLE LEGAL STANDARD

### A. Rule 12(b)(6) and Rule 8

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires dismissal of a complaint if it "fail[s] to state a claim upon which relief can be granted."  Though Rule 8 requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a motion

---

[3] "A responsive pleading must state whether the party does or does not consent to the entry of final orders or judgment by the bankruptcy court." Fed. R. Bankr. P. 7012(b).

[4] Dr. Yeh's filing of two motions to dismiss—including a request to dismiss the Trustee's claims with prejudice—without raising any jurisdictional issue could be taken as implied consent to the Court's authority to enter a final order on this matter. *See, e.g., LaMonica v. Harrah's Atl. City Operating Co. (In re JVJ Pharm. Inc.)*, 618 B.R. 408, 416 (Bankr. S.D.N.Y. 2020) (finding defendant impliedly consented where it ignored the mandate of Rule 7012(b) and litigated the merits of the claims through two motions to dismiss and a motion for summary judgment), *vacated on other grounds*, 630 B.R. 388 (S.D.N.Y. 2021); *LPB MHC, LLC  v. Farmers State Bank of Alto Pass (In re LPB MHC, LLC)*, No. 24-40450, 2025 WL 1778767, at *3 (Bankr. S.D. Ill. June 26, 2025) (finding defendant's conduct in pursuing and defending against summary judgment was indicative of implied consent where defendant failed to comply with Rule 7012(b)).

to dismiss should be granted if the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To satisfy Rule 8(a), the "[f]actual allegations must be enough to raise a right to relief above the speculative level" and advance the plaintiff's claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.[5] A pleaded claim is plausible if the allegations in the complaint "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

To determine plausibility, all well-pleaded facts set forth in the complaint are taken as true and viewed in a light most favorable to the plaintiff; however, "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement" do not constitute well-pleaded facts for purposes of a motion to dismiss. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009); *see also Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

---

[5] As explained in *Ashcroft v. Iqbal*:
> "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."

556 U.S. at 678 (citation modified).

B. Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure imposes a heightened pleading standard in cases where the plaintiff alleges fraud or mistake: "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Under Rule 9(b), a plaintiff who alleges fraud must identify the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 106 (4th Cir. 2025) (citation modified).

Courts are divided on the question of whether an actually fraudulent, as opposed to constructively fraudulent, transfer claim is subject to Rule 9(b)'s heightened pleading requirements, including within the Fourth Circuit. *Compare In re Tanglewood Farms, Inc. of Elizabeth City*, No. 10-06719, 2013 WL 1405729, at *9 (Bankr. E.D.N.C. Apr. 8, 2013) (applying Rule 9(b)) with *Bell v. Disner*, No. 3:14CV91, 2014 WL 6978690, at *6 (W.D.N.C. Dec. 9, 2014) (applying Rule 8). Although the historical background of fraudulent transfers[6] and the Official Comments to the Uniform Voidable Transfer Act[7] suggest fraudulent transfer cases

---

[6] *See* Matthew Kent Stiles, *9(B), or Not 9(B), That is the Question: Do Fraudulent Transfers Need to be Pleaded with Particularity?*, 59 UIC L. REV. 343, 372 (2026) ("From a historical and etymological point of view, fraudulent transfer cases should not be subject to Rule 9(b). Nor does it make sense from a policy view.").

[7] *See* UNIF. VOIDABLE TRANSACTIONS ACT § 4 cmt. 10 ("[A] procedural rule that imposes extraordinary pleading requirements on a claim of 'fraud,' without further gloss, should not be applied to a claim for relief under § 4(a)(1). The elements of a claim for relief under § 4(a)(1) are very different from the elements of a claim of common-law fraud. Furthermore, the reasons for such extraordinary pleading requirements do not apply to a claim for relief under § 4(a)(1).").

should not be subject to Rule 9(b), the consensus—according to a leading treatise[8] and numerous circuits[9]—is that Rule 9(b) applies.

Though the Fourth Circuit has yet to rule on the question, in at least two unpublished decisions, the district and bankruptcy courts for the Middle District of North Carolina have also required plaintiffs alleging actual fraud to satisfy the Rule 9(b) heightened pleading standard. *See Hongda Chem USA, LLC v. Shangyu Sunfit Chem. Co.,* No. 1:12CV1146, 2016 WL 4703725, at *5 (M.D.N.C. Sept. 8, 2016) (applying Rule 9(b) to actual fraudulent transfer claim under N.C. Gen. Stat. § 39-23.4(a)(1)); *In re Whitley*, No. 12-02028, 2013 WL 486782, at *13 (Bankr. M.D.N.C. Feb. 7, 2013) (analyzing a claim for actual fraudulent transfer under the Bankruptcy Code after noting that "North Carolina's fraudulent transfer statute is similar in form and substance to the Bankruptcy Code's fraudulent transfer provisions").[10] Given the persuasive authority from within the district, the Court

---

[8] Wright & Miller, FEDERAL PRACTICE AND PROCEDURE: CIVIL 4TH § 1297 ("Claims of fraudulent transfer or fraudulent conveyance are also subject to the heightened standard of Rule 9(b).").

[9] *See, e.g.*, *Sauer In. v. Lawson (In re Lawson)*, 791 F.3d 214, 217, 217  n.5 (1st Cir. 2015) (noting that Rule 9 is the appropriate pleading standard for an actual fraudulent transfer claim under the Rhode Island Uniform Fraudulent Transfer Act); *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) (New York Uniform Fraudulent Conveyance Act); *Stoebner v. Opportunity Fin., LLC*, 909 F.3d 219, 225, 226 n.6 (8th Cir. 2018) (Minnesota Uniform Fraudulent Transfer Act); *Pricaspian Dev. Corp. v. Martucci*, 759 F. App'x 131, 135-36 (3d Cir. 2019) (New Jersey Uniform Fraudulent Transfer Act); *Nw. Nat. Ins. Co. of Milwaukee, Wis. v. Joslyn*, 53 F.3d 331, at *1, 3 (6th Cir. 1995) (unpublished) (Ohio fraudulent transfer statute); *Nishibun v. Prepress Sols., Inc.*, 111 F.3d 138, at *1 (9th Cir. 1997) (unpublished) (California fraudulent transfer statute).

[10] North Carolina state courts have also applied the analogous heightened pleading standard of Rule 9(b) of the North Carolina Rules of Civil Procedure to claims for fraudulent conveyances. *See, Azure Dolphin, LLC v. Barton*, No. 16 CVS 7622, 2017 WL 4400223, at *10 (N.C. Super. Ct. Oct. 2, 2017) (citing *Doby v. Lowder*, 324 S.E.2d 26, 29-30 (N.C. Ct. App. 1984)); *see also BIOMILQ, Inc. v. Guiliano*, 2024 WL 1698061, at *18 (N.C. Super. Ct. Apr. 19, 2024).

will apply Rule 9(b) to the Trustee's claims of actual fraudulent transfer under N.C. Gen. Stat. § 39-23.4(a)(1).

Within the context of an actual fraudulent transfer claim, a plaintiff "must allege (1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfers and (3) the consideration paid with respect thereto." *Hongda Chem USA*, 2016 WL 4703725, at \*5 (quoting *Whitley*, 2013 WL 486782 at \*13). These pleading requirements under Rule 9(b) are relaxed when the fraudulent transfer action is brought by a bankruptcy trustee who, "initially, has only second hand information to rely upon in alleging a claim based upon fraud." *Whitley*, 2013 WL 486782 at \*13 (citing *Schnelling v. Crawford (In re James River Coal Co.)*, 360 B.R. 139, 163 n.15 (Bankr. E.D. Va. 2007)); *see also Aphton v. Aventis (In re Aphton Corp.)*, 423 B.R. 76, 85 (Bankr. D. Del. 2010).

FACTUAL BACKGROUND

The following facts are alleged in the Amended Complaint and accepted as true for purposes of deciding the Motion. Additional facts as alleged in the Amended Complaint may be incorporated into the discussion that follows.

The Debtor, Prairie E&L Management, LLC, is a North Carolina company started by former insurance mogul, now-convicted felon, Greg Lindberg. (Dkt No. 42, ¶¶ 1, 3). In 2019, Lindberg pleaded guilty to a wide-ranging conspiracy and money laundering scheme. Though complex,[11] the scheme boils down to Lindberg

---

[11] Numerous paragraphs of the Amended Complaint are devoted to describing the mechanics and ultimate fate of Lindberg's insurance fraud scheme. (Dkt No. 42, ¶¶ 21-28, 84-116). The Court assumes the parties' knowledge of the specific facts and allegations underlying that scheme and will reference them only as needed to resolve the Motion.

diverting—through myriad investments and deals—millions of dollars from his insurance businesses toward the acquisition and operation of other companies, (*Id.* ¶¶ 1, 3, 21), then using the purchase of those companies, as well as false reporting and circular financial transactions, to covertly siphon off some portion of the insurance money for his own personal benefit. (*Id.* ¶¶ 84, 92-94).

One of the recipients of this converted-insurance company money was the Debtor, which Lindberg used to facilitate the purchase of an optometry practice from Prairie Eye Center, Ltd. ("PEC"). (*Id.* ¶¶ 2-3, 21, 38). Dr. Yeh is the president, founder, and sole shareholder of PEC, an Illinois corporation consisting of seven optometry offices in Illinois. (*Id.* ¶¶ 29-30). Sometime in 2017, Dr. Yeh and Lindberg began negotiating for the sale of PEC's business; to that end, Lindberg created the Debtor in November 2017 as a special purpose entity to complete the contemplated transaction. (*Id.* ¶¶ 31-32). On December 18, 2017, Yeh, PEC, and the Debtor entered into an Asset Purchase Agreement ("APA"). (*Id.* ¶ 33).

Although it is illegal for non-physicians to own a medical practice under the Illinois Medical Corporations Act and the APA purports to sell only PEC's non-clinical assets, the parties' actual intention—as shown in closing instructions describing the stock purchase—was for the Debtor to acquire the medical practice itself with Dr. Yeh retaining only legal title. (*Id.* ¶¶ 36-37, 72-75). Under the accompanying Administrative Services Agreement, which was part of the broader sale, the Debtor was to be paid a services fee for managing the non-clinical aspects of the practice. (*Id.* ¶¶ 75, 81). But the fee—including, for instance, $1.17 million for

11

"Billing and Collections"—greatly exceeded a subsequent third-party agreement entered into by PEC, reflecting the parties' intention that the Debtor was purchasing the entire practice and all resulting profits. (*Id.* ¶¶ 34, 80-83).

The agreed purchase price of $25 million, with exceptions for working capital adjustments, greatly exceeded the value of the disparate assets. In Lindberg's own calculation, the "Net Assets Acquired," including "Intangible Assets" such as "customer relationships," "marketing related intangibles," and Dr. Yeh's "non-compete," carried a value of $7,098,979. (*Id.* ¶ 55). To ensure the assets balanced the sale price, Lindberg added another $19 million in "goodwill" after "Net Assets Acquired." (*Id.* ¶¶ 50-53).

On or about January 10, 2018, the parties closed the sale. (*Id.* ¶ 35). At closing, the Debtor paid $12,540,306 to Dr. Yeh and PEC as an initial payment, with Dr. Yeh herself receiving approximately $10 million. (*Id.* ¶ 50). Lindberg personally received $1,482,340 at closing in the form of various fees nominally related to loan origination and due diligence. (*Id.* ¶¶ 68-69).

Lindberg used another of his companies, Blue Daffodil, LLC, to loan the Debtor the necessary funds to close the transaction with Dr. Yeh. (*Id.* ¶¶ 10). Blue Daffodil, for its part, had obtained the funds it ultimately loaned to the Debtor from money Lindberg diverted from his insurance companies. (*Id.* ¶¶ 3, 10, 31). The loan from Blue Daffodil was ostensibly to be secured in some fashion, but Lindberg never filed the UCC financing statement; only years later did one of the defrauded insurance companies attempt to perfect the security interest. (*Id.* ¶ 40).

Akin to other purchases Lindberg made with converted insurance company money, Lindberg's ultimate goal was to use the purchase of PEC as subterfuge to skim millions of dollars for his own personal benefit while leaving a significantly overleveraged operating company that would be unable to pay the purported loan as it came due. (*Id.* ¶¶ 93-101). Though the PEC sale personally netted Lindberg $1,482,340, he caused the Debtor to incur a purported loan of $21,450,000 to obtain a company with net assets he valued at $7,098,979. (*Id.* ¶¶ 56, 68). Though the Debtor generated millions in gross revenue post-sale, its expenses easily outpaced income leading to a negative cash flow every year after the sale (*Id.* ¶ 62). In 2018, the first year after the sale, the Debtor lost $1.7 million; in 2019 it lost $3.4 million. (*Id.* ¶¶ 58-60). The EBITA calculations—earnings before interest, taxes, and amortization—reflected a similar rapid downtown for the Debtor after the purchase; Lindberg valued the optometry practice at 10 times EBITA for purposes of the sale price, but EBITA decreased in 2018 and by 2019 had dropped to $400,000. (*Id.* ¶¶ 59-60). The financial situation never improved; although the Debtor remained operational from 2018 to 2024, it did so only through additional cash infusions from Lindberg's other companies totaling $3,412,818. (*Id.* ¶¶ 61, 63).

The Debtor also failed to perform its obligations under the terms of the loan, which called for quarterly payments of $53,625; the proof of claim filed by Blue Daffodil in the underlying bankruptcy case indicates the Debtor never made any payments, and no principal was ever repaid on the loan. (*Id.* ¶¶ 40-42). Even when the Blue Daffodil loan was amended in 2019, which substantially reduced and

13

deferred the debt-service obligations, the Debtor failed to make a single payment due. (*Id.* ¶¶ 44-46).

When Lindberg's fraudulent enterprise began to unravel, many of his insurance companies were placed into rehabilitation by regulators, with NHC Holdings, LLC ("NHC") created as a result. (*Id.* ¶ 22). NHC, as the eventual manager of the Debtor, authorized the filing of a voluntary petition under chapter 7 of the Bankruptcy Code on February 18, 2025. (Case No. 25-10087, Dkt. Nos. 1, 2).

In February 2023, Lindberg was indicted in the Western District of North Carolina and, in November 2024, pleaded guilty to wire fraud, investment advisor fraud, money laundering conspiracy, and crimes in connection with insurance businesses. (Dkt. No. 42, ¶¶ 109-110). Lindberg converted as much as $2.58 billion dollars of insurance company money through various schemes, including the purchasing of operating companies, but to date the Special Master appointed in the criminal proceeding has only recovered approximately $349 million, with many more years of liquidation efforts anticipated. (*Id.* ¶¶ 112-13).

## DISCUSSION

### 1. Triggering Creditors Under § 544(b)

The Trustee seeks avoidance of the Debtor's transfer and obligation to Dr. Yeh under § 544(b) of the Bankruptcy Code, which provides a bankruptcy trustee with the power to "avoid any transfer of an interest of a debtor in property or an obligation incurred by the debtor that is voidable under applicable law by a creditor

14

holding an unsecured claim that is allowable under section 502 of this title."
11 U.S.C. § 544(b)(1).

"[Section] 544(b)(1) itself does not provide a substantive cause of action. Instead, it provides a procedural vehicle for such action if, but only if, an 'applicable law' allows an unsecured creditor to void a transfer or obligation." *Cook v. United States (In re Yahweh Ctr., Inc.)*, 27 F.4th 960, 964 (4th Cir. 2022). A bankruptcy trustee can functionally "step into the shoes" of a creditor for the purpose of asserting causes of action under state fraudulent conveyance acts, meaning the North Carolina Uniform Voidable Transactions Act (the "NCUVTA") can serve as the "applicable law" under § 544(b)(1). *See United States v. Miller*, 604 U.S. 518, 531-32 (2025) (observing the "long-settled understanding of the trustee's § 544(b) powers," which place the trustee in the shoes of the creditor, "subject to the same limitations and disabilities that would have beset the creditor in the prosecution of the action on his own behalf") (*quoting Davis v. Willey*, 263 F.3d 588, 589 (N.D. Cal. 1920)); *Cook*, 27 F.4th at 965 (finding "§ 544(b)(1) kicks in" and allows bankruptcy trustee to step into the shoes of an unsecured creditor under the NCUVTA). The creditor providing its proverbial shoes to a trustee is known as the "triggering" or "golden" creditor. *See In re Omansky*, No. 18-13809, 2022 WL 4281472, at *6 (Bankr. S.D.N.Y. Sept. 15, 2022) (referencing the "golden creditor" issue); *Bledsoe v. Flamingo Props., LLC (In re Musselwhite)*, No. 20-00928-5-SWH, 2021 WL 4342902, at *8 n.5 (Bankr. E.D.N.C. Sept. 23, 2021) ("The triggering creditor, the one who the trustee chooses to step into its shoes under § 544(b)(1) as the 'creditor holding an

15

unsecured claim that is allowable,' is informally referred to as the 'golden creditor.'") (citation modified).

At the motion-to-dismiss stage, a plaintiff is not required to identify a specific creditor by name and may instead plead the existence of a category or group of creditors holding allowable claims. S*ee Schnelling*, 360 B.R. at 160; *Giuliano v. U.S. Nursing Corp. (In re Lexington Healthcare Grp.)*, 339 B.R. 570, 576 (Bankr. D. Del. 2006); *Wansdown Props. Corp. N.V. v. Azari (In re Wansdown Props. Corp. N.V.)*, 647 B.R. 23, 33 (Bankr. S.D.N.Y. 2022). Here, the Trustee has identified three different groups of triggering creditors: (1) defrauded insurance companies; (2) defrauded policyholders; and (3) trade creditors. (Dkt. No. 42, ¶¶ 122, 138, 154). The Amended Complaint pleads three separate causes of action under § 544(b) and N.C. Gen. Stat. § 39-23.4(a)(1), all similarly seeking to avoid the transfer and obligation to Dr. Yeh and distinguished only by the identity of the triggering creditor group.[12]

Seeking to dismiss the second cause of action, Dr. Yeh contends that defrauded insurance policyholders are not creditors for purposes of N.C. Gen. Stat. § 39-23.4(a)(1). (Dkt. No. 44, at 20). The Trustee, she argues, "does not allege any facts sufficiently demonstrating that any policyholder held a claim against [the Debtor]" and "failed to allege how a policyholder could assert a claim against [the Debtor] as a subsequent transferee of a fraudulent transfer." (Dkt. No. 44, at 20-21).

---

[12] Other than the named triggering creditor, the three causes of action are identical in every respect. Because the same transfer and obligation to Dr. Yeh are central to each one, and "a single creditor who may pursue a particular claim is sufficient to 'trigger' the Trustee's standing to pursue the claim under section 544," *Jalbert v. Flom (In re Bicomny, LLC)*, 633 B.R. 25, 36 (Bankr. S.D.N.Y. 2021), it is unclear why the Trustee pursued her avoidance claim as three separate causes of action, tethering each one to a specific triggering creditor, rather than identifying all three groups under a single cause of action.

16

In response, the Trustee states that policyholders have claims against the Debtor as an intermediate transferee of funds fraudulently transferred from the insurance companies. (Dkt. No. 48, at 25-26).

The NCUVTA provides that a creditor may avoid a fraudulent transfer or obligation, N.C. Gen. Stat. § 39-23.4(a), and defines "creditor" as "a person that has a claim." N.C. Gen. Stat. § 39-23.1(4). The definition of "claim" is derived from the Bankruptcy Code and is broadly defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." N.C. Gen. Stat. § 39-23.1(3), cmt 3.

To qualify as creditors under the NCUVTA, therefore, the policyholders must have some relationship with the Debtor that provides them with a right to payment. In the Trustee's view, policyholders are creditors of the Debtor through a multistep process: policyholders initially have claims against their respective insurance companies arising from Lindberg's insurance fraud and have accompanying claims against Blue Daffodil and the Debtor as subsequent transferees of allegedly fraudulent transfers made by those insurance companies. (Dkt. No. 42, ¶¶ 141-43).

The allegations stated in the Amended Complaint, however, are insufficiently pleaded to establish the first step. None of the policyholders have filed claims in the Debtor's bankruptcy case expounding on the basis of their potential claims against insurance companies, and though it is true that "the creditor whose rights the trustee is asserting need not have filed a proof of claim," 5 COLLIER ON BANKRUPTCY

17

¶ 544.06 (16th ed. 2026), the Trustee must nevertheless "provide facts from which it can be plausibly concluded that there is at least one legitimate creditor of the estate." *Stephens v. Bonaparte (In re Stephens)*, No. 21-42857, 2024 WL 74897, at *19 (Bankr. E.D.N.Y. Jan. 5, 2024). At best, the Amended Complaint obliquely references a potential cause of action against the insurance companies for conversion or fraudulent transfer of insurance funds. (Dkt. No. 42, ¶¶ 2, 10-11, 93). But the Trustee falls short of spelling out facts sufficiently explaining the policyholders' underlying claims against the insurance companies; she states only that "Lindberg's massive insurance fraud left the insurance companies insolvent and owing billions to the policyholders," and "the policyholders therefore have claims against the insurance companies." (*Id.* ¶¶ 137-38). These allegations are simply too conclusory to allow the Court to plausibly find the existence of a policyholder claim against the insurance companies, which is a vital first link in the chain showing that policyholders are creditors of the Debtor under the NCUVTA.

To be sure, it may be possible there exists a policyholder who has become a creditor of the Debtor in the manner suggested by the Trustee, and whether a qualifying creditor in fact exists is often a determination best "left until motions for summary judgement, if not later." *45 John Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 742 (Bankr. S.D.N.Y. 2019). Still, given the attenuated and unclear nature of any claim a policyholder might have that would lead to a claim against the Debtor under the NCUVTA and the complexity of the transfers providing the basis for any such claim, the lack of basic

18

factual assertions in the Amended Complaint supporting the existence of a policyholder-creditor leaves the issue at the speculative level rather than crossing into the plausible. Accordingly, the Court finds the Trustee has not sufficiently alleged the existence of a policyholder that could serve as a triggering creditor for purposes of 11 U.S.C. § 544(b)(1), and it will therefore grant the Motion with respect to the second cause of action for failure to plead the existence of a qualifying creditor.

> 2.    Actual Fraudulent Transfers Under N.C. Gen. Stat. § 39-23.4

As to the remaining two categories of triggering creditors, insurance companies and trade creditors, the Trustee is pursuing claims for actual fraud under the NCUVTA, which provides that a transfer made by a debtor is voidable if the transfer was made "with intent to hinder, delay, or defraud any creditor of the debtor." N.C. Gen. Stat. § 39-23.4(a)(1). Because "direct evidence of such an intention is a rarity," *United States ex rel. Bunk v. Gov't Logistics N.V.*, 842 F.3d 261, 276 (4th Cir. 2016), and actual intent "is inherently difficult to determine," a transferor's intent is more often "inferred from extrinsic evidence and the presence of badges of fraud." *Sparkman v. Coley (In re Coley)*, 608 B.R. 625, 635 (Bankr. E.D.N.C. 2019) (quoting *Bakst v. Clarkston (In re Clarkston)*, 387 B.R. 882, 887 (Bankr. S.D. Fla. 2008)).

To that end, the NCUVTA itself lists thirteen nonexclusive examples of badges of fraud to find circumstantial evidence of fraud:

> (1) The transfer or obligation was to an insider;

19

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor;

(12) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and

(13) The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4(b).

"The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent; however, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose." *Coley*, 608 B.R. at 636 (quoting *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002)); *see also Sink v. Albrecht (In re Albrecht)*, No. 25-01097, 2026 WL 447203, at *9 (Bankr. E.D.N.C. Feb. 13, 2026). "When analyzing these factors to make a determination of the debtor's intent, a court should evaluate the entirety of the

20

circumstances surrounding the transaction at issue and 'may appropriately take into account all indicia [negating] as well as those suggesting fraud.'" *In re Schofield-Johnson, LLC*, 462 B.R. 539, 543 (Bankr. M.D.N.C. 2011) (quoting N.C. Gen. Stat. § 39-23.4(b) cmt. 6)). The statutory factors or badges listed in § 39-23.4(b), however, are simply "utilizable as potentially helpful guidelines," and "the words employed in [the] statutory introduction to the factors indicate that they are not intended to be mandatory nor exclusive." *Cherry Cmty. Org. v. Sellars*, 871 S.E.2d 706, 717 (N.C. 2022).

The Trustee's causes of action against Dr. Yeh seek to avoid the approximately $10 million that Dr. Yeh personally received as an initial payment, any other transfers Dr. Yeh received from the Debtor as part of the PEC medical practice sale, and the Debtor's obligations to pay any remaining balance owed on the $25 million sale price. (Dkt. No. 42, ¶¶ 132-34, 150-52, 161-63). Dr. Yeh moves to dismiss the Amended Complaint, arguing it does little more than "double down" on the same "fundamental defect" of the Complaint, namely an improper inference that Lindberg's "ponzi-like scheme" of defrauding insurance companies renders any transaction connected to it *per se* voidable. Rather than curing the defects in the Complaint, she argues, the Trustee "offers only conclusory allegations of creditor harm and rote recitations of purported badges of fraud in connection with a massive fraudulent scheme." (Dkt. No. 44, at 1-2).

The Court disagrees. The Amended Complaint noticeably improves on the Complaint through additional factual allegations, stated with particularity, (1)

21

supporting the existence of several additional statutory badges of fraud, (2) bolstering the previously alleged badge for lack of reasonably equivalent value, and (3) connecting the Debtor's transfer to Dr. Yeh to Lindberg's broader conspiracy. The allegations also specifically identify the property involved in the transfer, the timing of the transfer, and the consideration paid.

In terms of the statutory badges of fraud under N.C. Gen. Stat. § 39-23.4(b), the original Complaint relied solely on Badge 8, which the Court found insufficiently pleaded. In contrast, the Court finds the Amended Complaint pleads facts to support the existence of the following:

**Badge 4—Threatened With Suit.** A badge of fraud can be found where, "[b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit." N.C. Gen. Stat. § 39-23.4(b)(4). This badge is premised on the idea that "the pendency of litigation implies fraudulent intent when the circumstances show that there is a causal connection between the threatened litigation or judgment and the transfer." *Ingalls v. SMTC Corp. (In re SMTC Mfg. of Tex.)*, 421 B.R. 251, 310-311 (Bankr. W.D. Tex. 2009) (citation omitted). The Trustee alleges that insurance regulators were investigating Lindberg and his companies during negotiations with Dr. Yeh and PEC and, just months after the sale closed, the North Carolina Department of Insurance and Lindberg entered into a consent order granting regulators enhanced supervision of Lindberg's enterprise and limiting his ability to pursue similar financial transactions. (Dkt. No. 42, ¶¶ 103, 127(d)). Though a close call, the Court draws all inferences in favor of the Trustee

22

for purposes of the Motion, and as such, finds the Trustee has pleaded a sufficient causal connection between insurance regulators' investigation and threatened litigation and the Debtor's transfer to Dr. Yeh. The allegations, at least at this stage, support this badge of fraud enough to allow the matter to proceed to discovery. *See Maxus Liquidating Trust v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 518-20 (Bankr. D. Del. 2022) (assessing the relationship between pending environmental litigation against defendants and an allegedly fraudulent transfer); *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 283-84 (Bankr. S.D.N.Y. 2013) (finding fourth badge of fraud at trial where the debtor had been in environmental litigation for years and evidence showed it transferred assets after receiving a demand letter from the EPA for remediation costs).

**Badge 8—Lack of Reasonably Equivalent Value.** The NCUVTA does not define reasonably equivalent value, *Cook*, 27 F.4th at 965, and due to the "dearth of North Carolina caselaw," courts typically apply the same meaning used in assessing actual fraudulent claims under 11 U.S.C. § 548. *Robichaux v. Moses H. Cone Mem. Hosp. Operating Corp. (In re Randolph Hosp., Inc.)*, 644 B.R. 446, 466 (Bankr. M.D.N.C. 2022). Though undefined, the phrase "'without receiving a reasonably equivalent value' . . . generally means a debtor received nothing in return or at least nothing close to the value of the property transferred or the obligation incurred." *Cook*, 27 F.4th at 965 (citing 5 COLLIER ON BANKRUPTCY ¶ 548.05[1] (16th ed. 2021)). Reasonably equivalent value is "a question of fact" dependent on "all the facts and circumstances surrounding the transaction in question," *Ivey v. Swofford (In re*

23

*Whitley)*, 463 B.R. 775, 785 (Bankr. M.D.N.C. 2012) (citing *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 73 (Bankr. W.D.N.C. 2002), and is ill-suited to be decided on a motion to dismiss. *See Golden v. Clay Lacy Aviation, Inc. (In re Aletheia Rsch. & Mgmt., Inc.)*, No. 15-1081, 2015 WL 8483728, at *8 (9th Cir. BAP, Dec. 10, 2015) (holding that the bankruptcy court erred in making a factual determination as to reasonably equivalent value at the motion to dismiss stage because the issue was "clearly a question of fact" not appropriate to decide in that context) (citing cases).

Unlike in the Complaint, where the Trustee relied solely on the "illegal" nature of the sale under the Illinois Medical Corporation Act, in the Amended Complaint the Trustee alleges the $25 million that the Debtor agreed to pay for the PEC medical practice, including the $12,540,306 as an initial payment, was "grossly excessive" and "disproportionate to any reasonable valuation of PEC." (Dkt. No. 42, ¶¶ 49, 51). Lindberg valued the net assets acquired from PEC at $7,098,979, a figure that already included $5,700,000 from intangible assets such as customer relationships, market related intangibles, and Dr. Yeh's non-compete. (*Id.* ¶¶ 52-53). To ensure the assets balanced the sale price, however, Lindberg added an additional $19 million in "goodwill." (*Id.*)

North Carolina courts have found that "goodwill is an asset that must be valued and considered in determining the value of a professional practice." *Poore v. Poore*, 331 S.E.2d 266, 271 (N.C. Ct. App. 1985) (analyzing goodwill in the context of equitable distribution). A valuation of goodwill may factor in "the age, health, and

24

professional reputation of the practitioner, the nature of the practice, the length of time the practice has been in existence, its past profits, its comparative professional success, and the value of its other assets." *Id.* Although including goodwill as an acquired sale asset is common, and goodwill is "often the most valuable" component of a professional practice, *id.*, here, the Amended Complaint pleads specific facts supporting the Trustee's assertion that the $19 million in listed goodwill acquired in the PEC sale was "fake." (Dkt. No. 42, ¶ 7). Lindberg's evaluation of the sale already accounted for $5.3 million in "intangible assets" like "customer relationships" before he added the additional $19 million in undefined "goodwill." (*Id.* ¶¶ 52-53).[13] And after discounting the potential double-counting of intangible assets, the face amount of the goodwill is high in comparison to the rest of the acquired assets. (*Id.* ¶¶ 52-53).[14] This questionable valuation of goodwill supports the Trustee's assertion that the Debtor did not receive reasonably equivalent value for its transfer and incurred obligation.[15] Because goodwill is "an intangible asset which defies precise definition

---

[13] Because the typical definition of goodwill includes these types of intangible assets, it is unclear what other additional value could be encompassed by the $19 million line item that was not already accounted for in the "intangible assets" category. *See* Goodwill, BLACK'S LAW DICTIONARY (12th ed. 2024) (Goodwill is "[a] business's reputation, patronage, *and other intangible assets* that are considered when appraising the business, especially for purchase.") (emphasis added).

[14] Lindberg's calculation of the sale provided tabulated figures for "Acquired Tangible Assets" ($8,129,308), "Intangible Assets" ($5,700,000), and "Assumed Liabilities" ($6,730,329). (Dkt. No. 42, ¶ 52).

[15] Despite an oversimplified reliance on the Illinois Medical Corporation Act in the Amended Complaint, evidence regarding the legality of the sale may nevertheless provide some support for the Trustee's allegation that the Debtor did not receive reasonably equivalent value for the transfer. (Dkt. No. 42, ¶¶ 71-83). Illinois courts will refuse to enforce contracts for the sale of a medical practice that run afoul of the Medical Corporation Act, and the in pari delicto doctrine will generally preclude courts from reimbursing plaintiffs for fees already paid under voided contracts. *See Vine St. Clinic v. HealthLink, Inc.*, 856 N.E. 2d 422 (Ill. 2006). The Debtor, therefore, may have transferred $12.5 million to purchase a medical practice under a contract that Illinois courts would not enforce in the event Dr. Yeh and PEC refused to honor it.

and valuation," any determination of its existence and value "is a question of fact and not of law and should be made with the aid of expert testimony." *Poore v. Poore*, 331 S.E.2d 266, 271 (N.C. Ct. App. 1985) (citation modified). Dr. Yeh may ultimately present evidence regarding the acquired goodwill that vindicates Lindberg's valuation and demonstrates reasonable equivalent value for the transfer, but that is a fact-dependent determination that cannot be made at this stage.

**Badge 9—Debtor Insolvency Shortly After Transfer.** Insolvency is statutorily defined under the NCUVTA as the situation where "at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets." N.C. Gen. Stat. § 39-23.2(a). In addition, a rebuttable presumption of insolvency is given for a "debtor that is generally not paying the debtor's debts as they become due other than as a result of a bona fide dispute." N.C. Gen. Stat. § 39-23.2(b); *see Robichaux*, 644 B.R. at 463. Like reasonably equivalent value, insolvency is generally a "factual determination[] that should be reserved for discovery." *Beskrone v. OpenGate Capital Grp. (In re Pennysaver USA Publ'g, LLC)*, 587 B.R. 445, 456 (Bankr. D. Del. 2018); *see also Halperin v. Morgan Stanley Investment Mgmt. (In re Tops Holding II Corp.)*, 646 B.R. 617, 658 (Bankr. S.D.N.Y. 2022) ("Given the nature of the solvency determination, it is well recognized that insolvency is ordinarily a question of fact, requiring the court usually to weigh a significant amount of evidence, and thus courts should not dismiss a complaint that contains sufficient facts to permit a plausible inference of insolvency even if the defendant has its own plausible arguments for solvency.") (citation modified).

The Trustee alleges the Debtor became insolvent shortly after the transfer to Dr. Yeh. (Dkt. No. 42, ¶ 127(e)). The Debtor incurred a substantial debt of $21,450,000 shortly before the transfer of $12,540,306 to purchase the PEC optometry practice, approximately $10 million of which went to Dr. Yeh. (*Id.* ¶ 50). The Trustee has plausibly alleged that the value of the assets the Debtor acquired in the sale was significantly less than the debts it incurred, thus leaving the Debtor insolvent for purposes of the NCUVTA. (*Id.* ¶¶ 52-53, 59-60). The Trustee further alleges that, shortly after the transfer, the Debtor was operating at a loss and failed to pay its debts as they became due. (*Id.* ¶ 62, 100). Specifically, the Debtor "ran a loss every year after the sale" and never made any payments on its largest debt owed to Blue Daffodil. (*Id.* ¶¶ 42-43, 60-63). The Court, therefore, finds the Amended Complaint makes sufficient factual allegations regarding the Debtor's financial condition during and shortly after the transfer to state a plausible claim that it became insolvent as a result.

**Badge 10—Transfer Occurred Shortly After Substantial Debt Incurred.** The Trustee alleges the transfer to Dr. Yeh occurred shortly after the Debtor incurred a substantial debt of $21,450,000. (*Id.*, ¶ 50). The Amended Complaint pleads that the amount of the loan greatly exceeded the net asset value of the acquired company, and the Debtor was incapable of repaying the debt as evidenced by its failure to make any payments on the original loan or on the reduced and deferred terms provided through the loan's modification in 2019. (*Id.* ¶¶ 56, 42-46, 49).

27

**Non-Statutory Factors.** In granting Dr Yeh's first motion to dismiss, the Court found the Trustee improperly relied on a Ponzi scheme-like presumption, hoping to utilize Lindberg's broader conspiracy to establish the Debtor's fraudulent intent with respect to the transfer to Dr. Yeh, but without linking the two. As the Court explained in its bench ruling, courts have largely declined to extend such a presumption beyond "the peculiar characteristics of a Ponzi scheme," *Geron v. Craig (In re Direct Access Partners, LLC)*, 602 B.R. 495, 540 (Bankr. S.D.N.Y. 2019), and "criminal behavior in raising funds or in operating a business, while reprehensible, does not warrant a fraudulent conveyance claim unless the perpetrators of the crime intended that transfer of funds by the business would hinder, delay or defraud creditors, or at least knew that the inevitable and unavoidable effect of such transfers would be to leave creditors unpaid." *Id.* at 541; *see also In re Reagor-Dykes Motors, LP*, No. 18-50214-RLJ-11, 2022 WL 2046144, at *8 (Bankr. N.D. Tex. June 3, 2022) ("The Fifth Circuit has narrowly defined Ponzi schemes and has limited application of the Ponzi-Scheme Presumption to true Ponzi schemes.").

Nevertheless, while there is no "automatic Ponzi Scheme-Like presumption" where a fraudulent business scheme is shown to exist, it can be "treated as a badge of fraud to be weighed among other badges of fraud," *Yaquinto v. CBS Radio, Inc. (In re Texas E&P Operating, Inc.)*, No. 17-34386-SGJ-7, 2022 WL 2719472, at *10-11 (Bankr. N.D. Tex. July 13, 2022) (citing *In re Reagor-Dykes Motors, LP*, 2022 WL 2046144 at *7 ), and "[t]ransfers made in furtherance of a larger scheme to defraud may support an inference of fraudulent intent, but only where the allegations of the

28

complaint connect the specific transfers to the scheme." *Alameda Rsch. Ltd. v. Giles (In re FTX Trading Ltd.)*, No. 22-11068 (JTD), 2024 WL 4562675, at *8 (Bankr. D. Del. Oct. 23, 2024); *see also Furr v. TD Bank, N.A. (In re Rollaguard Sec., LLC)*, 591 B.R. 895, 918 (Bankr. S.D. Fla. 2018) (observing that "[j]ust because a debtor is involved in a fraudulent scheme does not mean that every transfer made by that debtor is made with fraudulent intent," and finding a plaintiff must show that the alleged fraudulent intent is related to the transfers sought to be avoided.).

The Trustee does just that in the Amended Complaint by adding pleading showing how the Debtor's transfer to Dr. Yeh connected to and furthered Lindberg's fraudulent scheme. The Trustee alleges that the Debtor's purchase of the PEC optometry practice bore all the hallmarks of the scheme, wherein "Lindberg used the purchase of operating companies as a subterfuge to convert insurance company money" for his own benefit. (Dkt. No. 42, ¶¶ 93). Lindberg purchased companies through conversion and sham loans to skim millions of dollars for himself while leaving overleveraged companies with no ability to repay the loans or the defrauded insurance companies. (*Id.* ¶¶ 93-101). The pleading in the Amended Complaint connects the transaction with Dr. Yeh to that conspiracy; Lindberg caused the Debtor to enter incur a substantial loan to, by his own calculations, acquire a significantly less valuable company while knowing the Debtor would be unable to repay the purported loan from Blue Daffodil, all in order to enrich himself by nearly

29

$1.5 million dollars. (*Id.* ¶¶ 56, 58-60, 62).[16] Bearing in mind that the statutory list of badges of fraud is "not intended to be mandatory nor exclusive," *Cherry Cmty. Org.*, 871 S.E.2d at 717, and a court should "evaluate all the relevant circumstances involving a challenged transaction or obligation," N.C. Gen. Stat. § 39-23.4(b), cmt 7, the Court finds the Trustee's pleadings connecting Lindberg's scheme to the Debtor's transfer to Dr. Yeh are relevant to and bolster the allegations regarding the Debtor's actual intent to hinder, delay, or defraud its creditors.

Lastly, Dr. Yeh repeatedly argues that the Trustee's allegations regarding Lindberg's scheme and potential "dual motive" fail to show the Debtor acted with actual intent to hinder, delay, or defraud creditors, (Dkt. No. 44, at 7), and that the Amended Complaint "contains no allegation that [the Debtor] *itself* engaged in *any* illegal or fraudulent conduct." (Dkt. No. 49, at 5). The Debtor, however, "being an entity created by law, is incapable of formulating or acting with intent," and "for the purpose of recovering impermissibly transferred corporate assets . . . the intent of the officers and directors may be imputed to the corporation." *Schnelling*, 360 B.R. at 161. Determining whether an officer's fraudulent intent may be imputed to the corporation is an issue governed by state law, *see O'Melveny & Myers v. FDIC*, 512

---

[16] Dr. Yeh contends that the $1.5 million in fees that Lindberg received from closing the sale "may cut against the inference of fraudulent intent, as such payments are often consistent with a legitimate, profitable, and ongoing business transaction." (Dkt. No. 44, at 7-8) Dr. Yeh relies on *Geron v. Craig*, 602 B.R. 495 (Bankr. S.D.N.Y. 2019), where the court found no fraudulent intent around "profit distributions" that were based on the company's success, noting that "the fact that a profit distribution is made is more likely to mean that the parties believe the transferor is fully solvent and that the business is doing well, rather than a sign of bad intent." *Id.* at 545. Here, however, the allegations are that Lindberg's fees are based on services provided as part of the sale, rather than profit distributions. Moreover, the *Geron* court made its findings based on evidence produced at trial, rather than in the context of a motion to dismiss. The nature and reasonableness of Lindberg's fees are questions of fact the Court cannot resolve at the 12(b)(6) stage.

U.S. 79, 83 (1994), and, within the specific context of a fraudulent transfer where imputing a director or officer's intent to a transferor corporation is at issue, traditional rules of agency apply. *See Sher v. JPMorgan Chase Funding (In re Thornburg Mortg., Inc.)*, 610 B.R. 807, 820-23 (Bankr. D. Md. 2019); *Weisfelner v. Hofmann (In re Lyondell Chemical Company)*, 554 B.R. 635, 647-49 (S.D.N.Y. 2016). North Carolina courts have shown a willingness to impute to a corporation "the acts of its agents when the agents' acts are taken under color of authority and at least marginally benefit the corporation." *Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP*, No. 17 CVS 5480, 2018 WL 943954, at *27 (N.C. Super. Ct. Feb. 16, 2018). The Amended Complaint contains plausible allegations that Lindberg's acts, although primarily for personal benefit, were taken under the color of his authority to act for the Debtor and the Debtor received at least some incidental benefit from his wrongs. Ultimately, the question of whether Lindberg's acts can and should be imputed to the Debtor will be determined through discovery and trial because, "'generally, the existence and scope of agency relatonships are factual matters,' and are therefore often appropriately left to the jury." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 660 (4th Cir. 2019) (*quoting Metco Prods., Inc., Div. of Case Mfg. Co. v. NLRB*, 884 F.2d 156, 159 (4th Cir. 1989)); *see also Hylton v. Koontz*, 532 S.E.2d 252, 257 (N.C. Ct. App. 2000) ("Unless there is but one inference that can be drawn from the facts, whether an agency relationship exists is a question of fact for the jury.").

31

CONCLUSION

The Court finds the Amended Complaint, with respect to the First and Third Causes of Action, states a claim for actual fraudulent transfer under N.C. Gen. Stat. § 39-23.4(a)(1) and 11 U.S.C. § 544. Conversely, the Court finds the Trustee has not sufficiently alleged the existence of a qualifying creditor for purposes of the Second Cause of Action.

Accordingly, and for the reasons stated above, it is hereby ORDERED that the motion to dismiss the Second Cause of Action is GRANTED.

IT IS FURTHER ORDERED that the motion to dismiss as to the First and Third Causes of Action for failure to state a claim is DENIED.

**END OF DOCUMENT**

## PARTIES TO BE SERVED

Vicki L. Parrott, Chapter 7 Trustee for Prairie E&L Management, LLC

V.

Sandra Yeh, M.D., an individual, and Blue Daffodil, LLC.

Main Case No.  25-10087

AP No. 25-02016

John Paul Hughes Cournoyer, Bankruptcy Administrator
*via cm/ecf*

Sean Christopher Kulka on behalf of Defendant Sandra Yeh
*via cm/ecf*

Brian Richard Anderson on behalf of Defendant Sandra Yeh
*via cm/ecf*

Jimmy Chang on behalf of Plaintiff Vicki L. Parrott
*via cm/ecf*

Clint Shepperd Morse on behalf of Plaintiff Vicki L. Parrott
*via cm/ecf*

Blue Daffodil, LLC
2626 Glenwood Avenue, Suite 550
Raleigh, NC 27608